FILED
CLERK, U.S. DISTRICT COURT

5/20/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DD___ DEPUTY

1    JANE DOE

2    11151 Valley Blvd #4886,

3    El Monte, CA 91734

4    626-208-9665

5    Plaintiff in Pro Se

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   **JANE DOE**, an individual,          No.   2:20-cv-04525-JAK(PVCx)

12              Plaintiff,

13        v.                               **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

14   **GAVIN NEWSOM**, in his official
     capacity as the Governor of California;
15   **XAVIER BECERRA**, in his official
     capacity as the Attorney General of
16   California,

17              Defendants.

RECEIVED
CLERK, U.S. DISTRICT COURT

5/18/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DD___ DEPUTY

18

19

20

21        Plaintiff JANE DOE ("Plaintiff") alleges and complains the following, on information and

22   belief except for information identified as being based on personal knowledge.

23

24                         **INTRODUCTION**

25        1.    Cal. Penal Code §739 bans private citizens to pursue justice in the criminal courts

26   by initiating a criminal case themselves and leaves them zero alternative remedy in cases where

27   law enforcement personnel have failed crime victims.

28        2.    California, of course, is free to decide whether or not to prosecute against a

1

1   suspect. But it cannot shut crime victims out of criminal justice system, especially in a manner

2   that discriminates against them.

3       3.      Cal. Penal Code §739 discriminates against Plaintiff in her exercise of a

4   fundamental right without adequate justification.

5       4.      Plaintiff now brings this case to vindicate her constitutional right to equal

6   protection of the law, and to vindicate the rights of all other crime victims in California who no

7   longer feel secure in their community because of law enforcement personnel's egregious

8   indifference toward their safety.

9       5.      In this action, Plaintiff seeks a declaration invalidating, and order enjoining,

10   enforcement of Cal. Penal Code §739 against crime victims for criminal prosecution initiation.

11   This statute discriminates against crime victims, and obstructs their ability to pursue criminal

12   justice and seek accountability. It therefore violates the Equal Protection Clause of the

13   Constitution.

14       6.      As described in more detail below, law enforcement personnel's response to a

15   heinous crime – rape is conscience shocking. Law enforcement personnel's response includes

16   their discriminatory practice and ill will, their betrayal of public trust, and failure to protect

17   residents from victimization by rapists. Our law enforcement's response to rapes sends a

18   catastrophic message to the whole of our society. To rape victims: bringing a complaint is useless.

19   To rapists: you're allowed to rape as many women as you want and there will be no consequence!

20       7.      The enforcement of Cal. Penal Code §739 and law enforcement personnel's failure

21   on their duties subject Plaintiff and other crime victims to continued risk at the hands of

22   perpetrators who are never held accountable.

23

24                                      **PARTIES**

25       8.      Plaintiff, JANE DOE ("Plaintiff"), is a resident of County of Los Angeles, State of

26   California.

27       9.      Defendant Gavin Newsom ("Newsom") is the Governor of the State of California

28   (the "State") and is being sued in his official capacity. Newsom has "[t]he supreme executive

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   power" of the State and is charged with "see[ing] that the law is faithfully executed." CAL.

2   CONST. Art. V, § 1. As head of the Executive Branch, he has a duty to "supervise the official

3   conduct of all executive and ministerial officers," including the Attorney General. CAL. GOV'T

4   CODE § 12010. In light of these duties, Newsom has responsibility for enforcing Cal. Penal Code

5   §739.

6       10.    Defendant Xavier Becerra ("Becerra") is made a party to this action in his official

7   capacity as the Attorney General of California. Under California law he is the chief law

8   enforcement officer with supervision over all law enforcement agencies in the state. CAL.

9   CONST. Art. V, § 13.

10

11              **JURISDICTION AND VENUE**

12      11.    This Court has jurisdiction under 28 U.S.C. § 1331 because whether Cal. Penal

13   Code §739 violates the United States Constitution is a federal question.

14      12.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's

15   request for relief because that claim is "so related to claims in the action within [this Court's]

16   original jurisdiction that [it] form[s] part of the same case or controversy." 28 U.S.C. § 1367(a).

17      13.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial

18   part of the events or omissions that give rise to this action occurred within this district and state.

19

20          **CAL. PENAL CODE §739 AND IT'S EFFECT**

21      14.    Cal. Penal Code §739 provides that "When a defendant has been examined and

22   committed, as provided in Section 872, it shall be the duty of the district attorney of the county in

23   which the offense is triable to file in the superior court of that county within 15 days after the

24   commitment, an information against the defendant which may charge the defendant with either

25   the offense or offenses named in the order of commitment or any offense or offenses shown by

26   the evidence taken before the magistrate to have been committed. The information shall be in the

27   name of the people of the State of California and subscribed by the district attorney."

28      15.    Cal. Penal Code §739 offers no exceptions to its blanket prohibition on private

prosecution. When the state monopolizes a certain area, certain positive duties should be and are imposed on it. Thus, when the state employs prosecutors to initiate prosecutions, and the prosecutors fail to fulfill their duties, the harmed individuals should be allowed to bring an action.

16.     A tort victim can initiate an action against their infringer but a crime victim has no say on prosecution of their assailant.

17.     Cal. Penal Code §739 has both the purpose and effect of depriving crime victims of equal protection when law enforcement personnel conspire and practice discriminatory under-policing and selective under-enforcement against crime victims, including Plaintiff. Crime victims are being shut out of criminal justice system by Cal. Penal Code §739.

18.     The monopoly on criminal prosecution achieves no compelling state interest and undermines the quality of justice.

## CRIMINAL PROSECUTION AND SYSTEMIC FAILURE IN CALIFORNIA

19.     As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.

20.     American Bar Association Criminal Justice Standards for the Prosecution Function: Standard 3-1.2 Functions and Duties of the Prosecutor (b) The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict. Standard 3-4.4 Discretion in Filing, Declining, Maintaining, and Dismissing Criminal Charges (c) A prosecutor may file and maintain charges even if juries in the jurisdiction have tended to acquit persons accused of the particular kind of criminal act in question. (https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi on/ )

21.     In cases which involve a **serious threat** to the community, the prosecutor should

4

1   not be deterred from prosecution by the fact that in the jurisdiction juries have tended to acquit

2   persons accused of the particular kind of criminal act in question because prosecutors have an

3   ethical obligation to pursue difficult cases for public safety reasons.

4          22.    According to National District Attorneys Association ("NDAA"), rape cases rarely

5   have physical evidence that conclusively proves that a rape occurred. The evidence need not

6   **conclusively** prove that a rape occurred; rather, it must give the jury a sufficient **context** in which

7   to evaluate the victim's credibility. (http://atixa.org/wordpress/wp-

8   content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf)

9          23.    Physical evidence can prove that the intercourse happened, but not the absence of

10  consent. When there's no issue about who the assailant is DNA doesn't really contribute

11  anything. Victim's reaction or whether or not victim stays contact with the perpetrator is not a

12  crime element. It's prosecutor's duty to educate the jury the right way to identify whether or not a

13  crime occurred.

14        24.    In 2018 in California the arrest rate of rape is as low as 16.4% while arrest rate of

15  aggravated assault is 85.5%. (https://data-openjustice.doj.ca.gov/sites/default/files/2019-

16  07/Crime%20In%20CA%202018%2020190701.pdf)

| Law Enforcement Agency | Arrest rate between 2014 and 2018 | |
|---|---|---|
| | Rape | Aggravated Assault |
| Cotati Police Depart ("Cotati PD") | 33% | 58% |
| Concord Police Depart ("Concord PD") | 18% | 83% |
| Los Angeles County Sheriff's Depart ("LASD") | 34% | 62% |

21        25.    California law enforcement agencies have reported rape at "unfounded" rates in

22  recent years as <u>high</u> as 55% in Concord, 53% in Berkeley, and a statewide clearance rate

23  of <u>40.8%</u> in 2016 (higher than the national average of 37%). These fundamental investigative

24  problems still remain today.

25  (https://www.buzzfeednews.com/article/alexcampbell/unfounded#.wa7gk54Zr)

26        26.    Los Angeles County District Attorney's Office ("LADA") declares that their

27  office's top priority is the prosecution of violent and dangerous criminals – murders, rapists, gang

28  members, child abusers and robbers among them. (http://da.lacounty.gov/about/office-overview)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

27.     Jackie Lacey ("Lacey", Los Angeles County District Attorney) adopts "no policy" policy. As the largest local prosecutorial office in the nation, no written policies relating to prosecution of rape exists which suggests deliberate indifference to rape victims safety and a general disinterest in prosecuting sexual assaults due to bias (Lacey has publicly been criticized for inaction in the case of four women who report having been raped by actor Danny Masterson. Lacey has been aware that a pattern and custom of unconstitutional violations exists). The lack of written policy allows LADA Officials to make wholly arbitrary decisions.

28.     Lacey also enforces a "non-law", falsely requiring corroboration and evidence of force to establish rape, a requirement that is not required by law or jury instruction; (Lacey openly said acquaintance cases are particularly difficult to prove, unless the accused admits what happened, makes incriminating statements, or the victim's account can be corroborated with independent evidence, reflecting higher criteria compared to other crimes with no showing of valid state interest but solely aiming at conviction rate for prosecutor's own personal interest. (https://www.nbclosangeles.com/news/local/former-socal-police-officer-will-not-face-rape-charge/2227236/)

29.     Lacey consciously manipulates prosecution for political purposes. (https://variety.com/2020/politics/news/weinstein-rape-charges-los-angeles-1203461860/)

30.     Lacey employs disparate unwritten policy to rape cases compared to other type of crimes. According to prosecution data obtained by NBC4's I-Team, in LA County, in 2018 police presented 815 forcible rape investigations to prosecutors. Charges were filed in 188 reflecting an extremely low prosecution rate of 23%. This compares to a higher rate at every stage for non-rape crimes, reflecting the lowest priority of LADA's efforts.

31.     Contra Costa County District Attorney ("CCDA") declares that their office's mission is to seek justice and enhance public safety for all their residents by fairly, ethically, aggressively and efficiently prosecuting those who violate the law, and by working to prevent crime. (https://www.contracosta.ca.gov/7284/District-Attorney)

32.     Between 2017 and 2018, CCDA's prosecution rate of rape is as low as 34% although few sex crimes referred for prosecution by police and sheriff.

6

33.     District Attorney's Office of Sonoma County ("SDA")'s mission statement indicates that "We shall seek truth and justice in a professional manner, while maintaining the highest ethical standards." (http://da.sonoma-county.org/content.aspx?sid=1023&id=1379)

34.     Between 2017 and 2018 SDA's prosecution rate of rape is 31%, even lower than CCDA.

35.     Neither CCDA nor SDA adopts any written policies regarding prosecution of sexual assault.

36.     AEquitas is a national technical assistance provider that specializes in the prosecution of gender-based violence and human trafficking crimes. AEquitas is a nonprofit organization that brings decades of prosecution experience and collaborative approach to offer law enforcement advice and resources across disciplines at no cost. (https://aequitasresource.org/)

37.     Corroboration is not required by law for conviction. (https://aequitasresource.org/wp-content/uploads/2018/09/Model-Response-to-Sexual-Violence-for-Prosecutors-RSVP-An-Invitation-to-Lead.pdf)

38.     When LADA, CCDA, and SDA were asked to adopt "offender-focused approach" and "expert witness strategy" that are recommended by NDAA they maliciously refused, giving an ostensible reason that the case cannot be proved beyond a reasonable doubt and falsely told Plaintiff that jury would not believe expert witness. Bias against rape victims could not be clearer. <Prosecuting Alcohol-Facilitated Sexual Assault> (http://atixa.org/wordpress/wp-content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf), <Cold Case Alcohol- and Drug-Facilitated Sexual Assault> (https://www.sakitta.org/toolkit/docs/Cold-Case-Alcohol-and-Drug-Facilitated-Sexual-Assault.pdf), <Understanding the non-stranger rapist> (http://www.ncdsv.org/images/NDAA_UnderstandingNonstrangerRapist_TheVoice_vol_1_no_1_1_2007.pdf)

39.     The low number of arrests and prosecutions for sexual assault is not a statistical anomaly. The fact that so few people are arrested and held accountable for sexual assault is a direct result of a persistent pattern of indifference toward and disregard for the safety of rape victims by law enforcement personnel.

7

40.     The failure to properly investigate and prosecute sexual assault cases has been motivated at least in part by animus toward women reporting rape. Rape cases are deemed unworthy to investigate and prosecute and rapists are provided favoritism and leniency.

41.     Law enforcement personnel's actions or inactions, protocol and procedures, disproportionately affect female sexual assault victims generally and violated Plaintiff's equal protection rights. Law enforcement personnel's intentional acts and their policies and procedures have created the danger of an increased risk of harm to Plaintiff and other victims of sexual assault who are disproportionately women. All these failures come from a "long-standing refusal" to properly investigate and effectively prosecute sexual assault crimes against women.

42.     As described in more detail below, the following actions by prosecutors are neither in state's interest nor legitimate decisions of judgment but deplorable intentional antithesis of exercise of judgment:

    a.  Willfully refuse to perform their duties pursuant to professional standards;

    b.  Intentionally and consistently credit the suspect's version over Plaintiff's account because she is a rape victim, notwithstanding objective evidence;

    c.  Put their own interest ahead of the state which they serve;

    d.  Callously disregard victim and community safety by using absolute immunity as a badge and shield for their discriminatory practice with no showing of a valid state interest;

    e.  Deter Plaintiff from pursuing truth and justice by falsely telling her that there was not enough evidence and creating purported reasons to justify their discriminatory and unconstitutional treatment to Plaintiff because she is a woman reporting rape;

    f.  Made multiple untrue statements to Plaintiff that were far departure from professional standards, jury instruction, and prosecution guidelines which is a strong indicator that discriminatory intent was a motivating factor for prosecutors' wild spread custom;

    g.  Maliciously ignore the fact that a victim's testimony alone is legally sufficient evidence for filing charges but falsely told Plaintiff that there was no

8

1    corroboration, reflecting rape cases are less "worthy" of prosecution than other

2    crime cases; and

3       h.   Use "insufficient evidence" as a disguise to deprive Plaintiff of her constitutional

4           rights.

5    43.    Other failures by law enforcement personnel:

6    Prosecutors declined to bring charges against officers who fatally shot an unarmed man.

7    (https://www.scpr.org/news/2017/02/13/69009/appeals-court-dismisses-suit-over-gardena-police-

8    s/)

9    Victim family and activists demand criminal charges. (https://abc7.com/kenneth-ross-jr.-

10   gardena-police-shooting-ois-michael-robbins/5872326/)

11   No charges against officer who fatally shot an apparently intoxicated college student.

12   (https://www.presstelegram.com/2017/09/12/no-charges-against-long-beach-officer-involved-in-

13   2015-shooting-of-woodland-hills-student-feras-morad/)

14

15                    **PRIVATE PROSECUTION OUTSIDE CALIFORNIA**

16   44.    South Carolina: a private citizen may initiate a criminal case by approaching a

17   magistrate.

18   45.    Maryland: a private citizen has the right and the ability to appear before a District

19   Court Commissioner and write out an affidavit that lodges criminal charges against another

20   individual.

21   46.    Georgia: criminal process may be issued based on a request by a private citizen,

22   though only after a "warrant application hearing" at which the potential accused has an

23   opportunity to argue that charges should not be issued.

24

25                       **SEXUAL AND DOMESTIC VIOLENCE**

26   47.    It is a common misconception that most sexual assaults are committed by

27   strangers. In reality, sexual assault can be perpetrated by anybody. A woman is more likely to be

28   sexually assaulted by someone she knows— a friend, partner, date, classmate, neighbor or

                                          9

1  relative—than by a stranger in a dark alley. <Understand the Nature and Dynamics of Sexual

2  Violence> (https://www.mocadsv.org/FileStream.aspx?FileID=3)

3  <Dynamics of Sexual Violence> (https://www.youtube.com/watch?v=gSh7CmWGa58)

4         48.     Five categories of sexual violence (https://ndaa.org/wp-content/uploads/NDAA-

5  DV-White-Paper-FINAL-revised-July-17-2017-1.pdf):

6              a.   Rape or penetration of victim;

7              b.   Victim made to penetrate someone else;

8              c.   Non-physically pressured unwanted penetration;

9              d.   Unwanted sexual contact, defined as the "intentional touching of the victim or

10                  making the victim touch the perpetrator, either directly or through clothing . . .

11                  without the victim's consent";

12             e.   Non-contact unwanted sexual experiences, defined as the "unwanted exposure

13                  to sexual situations (e.g., pornography); verbal or behavioral sexual

14                  harassment; threats of sexual violence to accomplish some other end; and /or

15                  unwanted filming, taking, or disseminating photographs of a sexual nature of

16                  another person".

17        49.    The real threat of sexual assault that is posed not by strangers but rather by people

18 we know and trust. <Characteristics of Sexual Assault: What Does It Really Look Like?>

19 (https://www.evawintl.org/Library/DocumentLibraryHandler.ashx?id=42)

20        50.    A woman initially trusts the person who rapes her and welcomes him into her

21 home or accepts an invitation from him. She is then blamed for his actions and, sadly, often

22 blames herself, especially if her prior understanding of rape was based on more myth than fact.

23 And if the rapist is her husband, or partner, she may not anticipate that anyone, including herself,

24 would define that as rape. <Dynamics of Sexual Assault>

25        (http://www.ncdsv.org/images/Sexual%20Assault%20Dynamics%20for%20DV%20Advo

26 cates%20and%20Agency%20Responders%20-%20Tucker%205.28.08.pdf)

27        51.    Researches show that distorted thoughts is one of the main reasons women stay in

28 abusive relationships. Being controlled and hurt is traumatizing, and this leads to confusion,

<div align="center">10</div>

doubts, and even self-blame. For example, women shared: "I believed I deserved it." Others minimized the abuse as a way to cope with it, saying: "[I stayed] because I didn't think that emotional and financial abuse was really abuse. Because words don't leave bruises,'' and, "Because I didn't know what my boyfriend did to me was rape."

(http://www.ncdsv.org/images/Investigating%20and%20Prosecuting%20Intimate%20Partner%20 Sexual%20Assa....pdf); (https://law.lclark.edu/live/files/17491-countering-common-misperceptions-of-sa-victims)

52.     When prevailing myths go unchallenged rape is supported, justified, and even condoned. Myths tend to be victim blaming; instead of holding the perpetrator responsible for his behaviour, the victim is blamed and held responsible for the assault, especially in cases where the victim knows the perpetrator. Often victims of sexual violence are simply not believed. These circumstances make it much more difficult for victims to seek help and recover from their experience. <Sexual violence: prevalence, dynamics and consequences>

(https://www.who.int/violence_injury_prevention/resources/publications/en/guidelines_ch ap2.pdf)

53.     Intimate partner sexual violence is as dangerous or problematic to the community as other violent crimes. <Intimate Partner Sexual Violence>

(https://player.vimeo.com/video/120390159)

54.     When NFL linebacker Ray Rice knocked his fiancée Janay Palmer unconscious in an elevator in 2014, it didn't initially get much attention. He was accused of domestic violence and suspended for two games. After a few weeks, he was formally charged, but he and Palmer were married the next day. A security video quickly went viral showing Janay Palmer knocked down and roughly dragged out of the elevator by Rice. Victim's staying with their abuser does not erase the crime committed by the abuser.

55.     Both rape and battery are domestic violence and they should be treated the same way. No law requires a victim breaking up with their attacker to establish battery or rape.

**RAPE KIT BACKLOG**

11

56.     In 2009, Human Rights Watch uncovered a backlog of at least 12,669 untested rape kits in County of Los Angeles (including Los Angeles Police Department, LASD, and 47 independent police departments in Los Angeles County), the largest known backlog in the United States at that time. (https://www.hrw.org/report/2009/03/31/testing-justice/rape-kit-backlog-los-angeles-city-and-county) In 2015 there were 2400 untested rape kit found in Contra Costa County. However, there was never ever any backlog of DNA testing for murder or other crimes.

57.     The discriminatory practice against rape victims is long-standing, wildspread, and well settled. (https://www.huffpost.com/entry/the-rape-kit-backlog-shows-exactly-how-we-regard-women-in-this-country_n_5acfb5e1e4b016a07e9a8c65)

58.     The devaluation of sexual assaults burdens a particular set of victims. The laws against violence were not and will not be uniformly enforced. Because the vast majority of victims of sexual assault are women, discriminatory practice has an unjustified disparate impact on women. Rape is the most under-reported crime. 63% of sexual assaults are not reported to police. <Statistics about sexual violence>
https://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf)

59.     Discrimination against rape victims puts victims at a unique disadvantage in the criminal justice system, decreasing the rate of reporting rape and increasing the rate of claims withdrawn by victims. <Rape and Sexual Assault in the Legal System>
https://www.womenslawproject.org/wp-content/uploads/2016/04/Rape-and-Sexual-Assault-in-the-Legal-System-FINAL.pdf)

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

60.     Plaintiff grew up in a traditional household in a foreign county with long-standing social prohibitions on talking about sexual matters.

### *Rapes between 2013 and 2014*

61.     In 2013 Edward Weamer ("Weamer") was a police officer at Sonoma University Police Department. In Nov 2013 via an online app "POF" Weamer friended Plaintiff and started

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  chatting with her online.

2       62.    Before Plaintiff met Weamer in person she made a clear statement via text

3  messages that she didn't want to rush sex and insisted to stick to her traditional culture. Weamer

4  agreed to respect Plaintiff so Plaintiff decided to meet him in person.

5       63.    Once Plaintiff met Weamer in person, he didn't keep his words and forced himself

6  on top of Plaintiff around ten times between 2013 and 2014.

7       64.    Via Plaintiff's message conversations with Weamer he acknowledged that each

8  time Plaintiff said no and resisted. Plaintiff also accused Weamer that he set her up but she was

9  not able to recognize what Weamer had done to her was a crime due to her confusion about rape.

10  Plaintiff mistakenly thought rape was a crime committed by a stranger. < Understanding and

11  Countering Rape Myths >

12  (https://www.nationalguard.mil/Portals/31/Documents/J1/SAPR/SARCVATraining/Barriers_to_

13  Credibility.pdf)

14       65.    In Aug 2014 Plaintiff broke up with Weamer and never had contact with him

15  again. Over the years Plaintiff has been broken, and experienced depression, anxiety, and low

16  self-esteem but she didn't know where those came from until Oct 2019.

17       66.    In Oct 2019 Plaintiff met with LADA prosecutor Peter Cagney ("Cagney") and he

18  explained to Plaintiff what rape was. Plaintiff has realized what Weamer had done to her was in

19  fact rape.

20       67.    In 2013 Plaintiff was raped in Cotati. In 2014 Weamer raped Plaintiff in Concord.

21  Plaintiff filed the police reports with Cotati PD and Concord PD respectively on Oct 18, 2019.

22            *Cotati PD's Failure to Investigate Plaintiff's Sexual Assault Claim*

23       68.    After the initial report was filed on Oct 18, 2019 Cotati PD Officer Bennet Knight

24  ("Knight") informed Plaintiff of victims rights and followed up with Plaintiff the following week.

25  However, approximately three months after Plaintiff first reported the assaults Weamer was still

26  not contacted by Knight for investigation.

27       69.    Since Weamer refused to make a statement to Cotati PD he faced no investigation

28  or scrutiny from law enforcement. After little to no investigation conducted Knight maliciously

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    concluded the incidents were consensual and the case was subsequently submitted to SDA.

2        70.    Plaintiff obtained a copy of the incident report prepared by Knight and asked

3    Sergeant Baudelia Gallo ("Gallo") for an explanation but Gallo endorsed or approved those

4    failures by taking no correction action.

5              *Concord PD's Failure to Investigate Plaintiff's Sexual Assault Claim*

6        71.    After the initial interview with Concord PD Officer Shasta Vanetti on Oct 18,

7    2019, the following month Plaintiff heard nothing from CONCORD PD, no follow-up and

8    literally nothing.

9        72.    Sometime in November 2019 Plaintiff left voice mail to Detective Renenlle-Rey

10   Valeros ("Valeros") but still heard nothing from CONCORD PD in the following month.

11       73.    In December 2019 after Plaintiff reached out to Sgt Cody Harrison ("Harrison")

12   she finally got a phone call from Detective Valeros.

13       74.    Rather than ask relevant questions regarding crime elements the first thing Valeros

14   wanted to confirm was "So are you still living in Southern California?" Perhaps he thought he

15   could treat this case less seriously because the victim lived far away.

16       75.    Then Plaintiff was asked by Valeros what's her ultimate goal. Such humiliating

17   and degrading question strongly suggests his discriminatory animus towards Plaintiff as a rape

18   victim. Such question demonstrates that Valeros thought Plaintiff came forward for something

19   else other than justice. A victim of other crimes would not be asked about their goal to come

20   forward.

21       76.    Plaintiff was shocked to find out the suspect was not contacted nearly two months

22   after she reported the crime.

23       77.    Despite there is no statute of limitations for rape Valeros told Plaintiff this

24   happened five years ago. Even though Weamer admitted through texts that each time Plaintiff

25   said no and resisted Valeros told Plaintiff he could not prove it was Weamer who was texting.

26       78.    No useful information was extracted during Plaintiff's conversation with Valeros.

27   No question regarding the crime element was asked. The "investigation" conducted by Valeros

28   was meaningless with respect to proving a crime. Instead, Valeros' language reflects how he

                                            14

1    deterred Plaintiff from pursuing the case.

2    79.    Despite pretext phonecall is a commonly used technique to obtain confession from

3    the offender Valero opt not to use it, not to mention he would not spend any effort finding out if

4    there would be more women victimized by Weamer.

5    80.    In December 2019 Plaintiff was really concerned by Valeros' attitude and she

6    reached out to Sgt Harrison again. However, despite there is no statute of limitations for rape and

7    physical evidence is not required by law or jury instruction, Harrison falsely announced to

8    Plaintiff that the case was six years old and there was no physical evidence at all for filing

9    charges. Harrison didn't stop there. He further falsely told Plaintiff that there was no indication of

10   any type of sexual assault and appeared quite consensual which strongly suggests how

11   CONCORD PD Officers deterred Plaintiff from pursuing justice and CONCORD PD Officers'

12   discriminatory intent to discount and dismiss Plaintiff's allegation.

13   81.    After the horrifying interactions with Valero and Harrison Plaintiff reached out to

14   Lieutenant Tamra Roberts ("Roberts").

15   82.    Despite victim's testimony is legally enough to file charges Roberts falsely told

16   Plaintiff that her testimony was absolutely not enough and there was no evidence of sexual

17   assault.

18   83.    When there's no issue about who the assailant is DNA doesn't really contribute

19   anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says

20   on jury instruction, Roberts falsely told Plaintiff "There needs to be physical evidence, uh, either

21   DNA evidence or a confession from the suspect. Um, and we don't have any of those things. In

22   this case, there's no DNA evidence."

23   84.    The crime of battery (e.g. a punch) is established based solely on the perpetrator's

24   actions and/or intent. The victim's response to being punched is irrelevant. The victim need not

25   resist nor express unwillingness to being punched to establish a crime, nor is a victim's history of

26   being punched relevant. The relationship between the assailant and the victim does not make the

27   crime less seriously or make the victim suffer less.

28   85.    While Plaintiff pointed out that Weamer acknowledged each time Plaintiff said no

1   and resisted but Roberts challenged Plaintiff "But then you got back together with him and

2   continued." It's obvious that Roberts treat rape completely different from other crimes.

3       86.     There is no law requires victim act in certain way in order to prove she was raped.

4   Roberts' stereotype about how victims should behave constitutes unlawful discrimination.

5   Roberts' language also reflects her discriminatory intent to discredit Plaintiff and discard

6   Plaintiff's allegation. Roberts' announcement left Plaintiff feeling coming forward was a

7   punishment to herself and she should not have reported the incident to the police at all. Such

8   victim blaming does not occur with other types of crimes. Moreover, according to Roberts' theory

9   a man is entitled to rape a woman if they are in a relationship, suggesting a strong purposeful

10   animus towards Plaintiff.

11       87.     Although victim's reaction is not a crime element Roberts twisted Plaintiff's

12   account of story and announced to Plaintiff "You were okay with having sex." by ignoring how a

13   victim would process trauma. Then Roberts falsely told Plaintiff the text messages would only

14   work in the suspect's favor and there was no evidence of sexual assault.

15       88.     Battery and rape are both domestic violence. The law does not require a victim

16   break up with the assailant to establish battery but Roberts told Plaintiff "This is a different

17   situation. You continue to get together with him." Roberts imposed a non-law to require Plaintiff

18   break up with the suspect to establish rape. Roberts flat out told Plaintiff "Most people, if they got

19   raped, they wouldn't get together with that person again." Such remarks strongly suggest an

20   intention to treat sexual assault cases less seriously than other assaults, as well as an animus

21   against rape victims. Roberts' pro-defendant attitude is capable of several interpretations: perhaps

22   she believed that men are always entitled to sex in a relationship, that Plaintiff was not entirely

23   blameless because she stayed contact with the attacker, that such assault was less severe and

24   traumatic because she was dating this suspect, or that state officials should not intrude upon

25   dating violence. Whatever the reason, Roberts' language reflects an outdated misconception

26   concerning rapes that cannot be used as a source of differential treatment. Roberts' statement also

27   demonstrates her discriminatory intent to devalue Plaintiff's allegation.

28       89.     When Plaintiff pointed out rape should be treated the same way as battery Roberts

1 | responded "I don't think I can understand what you are saying."

2 |        90.     Regardless Plaintiff say no and resisted each time Roberts twisted it as sexual play.

3 | Roberts also declared "A district attorney would have a very hard time convincing a jury of 11

4 | people."

5 |        91.     The language and attitude of CONCORD PD Officers suggests that they made

6 | minimal or maybe no effort to investigate the suspect in Plaintiff's case. None has been done to

7 | see if there are more women victimized by the suspect. None has been done in order to support

8 | Plaintiff's allegation.

9 |        92.     Roberts went on and told Plaintiff "The district attorney's office won't prosecute

10 | on a case like this." "If we don't have any evidence, then we don't submit the case to the district

11 | attorney." "It is here in Contra Costa County, the district attorney's office would never file a case

12 | like this. Um, I've been doing this for 18 years. I've worked sexual assault for five years. Um,

13 | they will never file a case like this."

14 |        93.     Since Weamer refused to make a statement to Concord PD he faced no

15 | investigation or scrutiny from law enforcement.

16 |        94.     In December 2019 Plaintiff filed a complaint with Concord Police Chief Guy

17 | Swanger ("Swanger") but Plaintiff never received any investigation result. Swanger took no

18 | action to correct Valero's failures or to discipline him for his malfeasance.

19 |        95.     CONCORD PD personnel did not inform Plaintiff of victims' rights as set forth in

20 | California constitution. At that time, and at all relevant times, CONCORD PD personnel had full

21 | knowledge of CONCORD PD's mission and awareness of proper investigation protocol.

22 |        96.     By failing to discipline or act, Swanger endorsed or approved the unconstitutional

23 | conduct of individual officers.

24 |        97.     Plaintiff requested CONCORD PD's policy and procedures regarding sexual

25 | assault investigation but no such thing existed.

26 |                  *CCDA's Failure to Prosecute Plaintiff's Sexual Assault Case*

27 |        98.     In January 2020 CCDA declined to file charges against Weamer. Before the non-

28 | prosecution decision was made none of any member of CCDA met with Plaintiff in person, nor

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  did they ever speak to her about the alleged assaults.

2      99.    Given the way how law enforcement personnel responded to rapes, Plaintiff asked

3  herself "Can you imagine how many victims didn't get the justice they deserved?"

4      100.    On Jan 7, 2020 during a recorded phone call conversation Colleen Gleason

5  ("Gleason", CCDA prosecutor) told Plaintiff this was a he said she said case by ignoring the

6  objective evidence. Gleason announced that there was NO EVIDENCE to prove it was not

7  consensual by invaliding Plaintiff's testimony. By intentionally ignoring the context Gleason

8  falsely told Plaintiff that the jury would interpret it as rough sex and Plaintiff came forward

9  because she was upset about Weamer chasing other girls. Gleason took every word of Weamer as

10  true even though a normal person, through inference, could easily tell Weamer was lying. By

11  ignoring the fact that Plaintiff texted Weamer he set her up Gleason credited Weamer because

12  Weamer falsely said Plaintiff enjoyed the sex and put his penis in her vagina.

13      101.    At the end of the phone conversation with Gleason Plaintiff requested to speak

14  with her supervisor, Walpole. At that time, and at all relevant times, Gleason was aware of

15  CCDA's mission and her role as a prosecutor.

16      102.    In Jan 2020 Plaintiff notified Diana Becton ("Becton", District Attorney of Contra

17  Costa County) of the constitution violation.

18      103.    On Jan 8, 2020 during a recorded phone call conversation Christopher Walpole

19  ("Walpole", CCDA prosecutor) declared that it was their filing standard to file cases they

20  believed they could win. "We wouldn't file cases if we don't get a guilty verdict." "It's a big

21  hurdle." Walpole also announced that they would need strong corroboration despite it was not

22  required by law.

23      104.    In 2018 in California the conviction rate of violent offenses is 56.8% (https://data-

24  openjustice.doj.ca.gov/sites/default/files/2019-

25  07/Crime%20In%20CA%202018%2020190701.pdf). However, Walpole flat out told Plaintiff

26  "We only file cases we believe we can win. That's our filing standard."

27      105.    When Plaintiff questioned about the use of expert witness Walpole falsely told her

28  many times jury would disagree with the expert. Despite stereotype about how victims should

behave is unlawful discrimination and it's a prosecutor's job to select unbiased jury Walpole falsely told Plaintiff the jury would say "If I was in her shoes, I wouldn't have had the relationship."

106. By invaliding Plaintiff's testimony Walpole valued Weamer's version because Weamer falsely said Plaintiff put his penis inside her and being upset about Weamer seeing other women was Plaintiff's motive to pursue this case. Walpole also declared this was part of the #Metoo movement.

107. Although Plaintiff's motive is not a crime element Walpole attacked Plaintiff's motive of coming forward was the suspect seeing other women. Motive of victims of other assaults would not be attacked as a target.

108. The entire time Walpole tried his best to derail Plaintiff from pursuing the truth and justice, reflecting Walpole's conscious choice not to overcome common defenses. Rather than uphold the law, educate the jury, and overcome common defenses, Walpole chose to act as the suspect's advocate. At that time, and at all relevant times, Walpole was aware of CCDA's mission and his role as a prosecutor and supervisor.

109. On Jan 25, 2020 Plaintiff filed a complaint with CCDA regarding the constitutional violation and Becton was put on notice.

110. Plaintiff requested CCDA's policy and procedures regarding sexual assault prosecution but no such thing was available.

111. BECTON failed to draft or implement procedures in the District Attorney's Office to ensure proper investigation of rape cases and proper review and handling of sexual assault prosecutions.

### *SDA's Failure to Prosecute Plaintiff's Sexual Assault Case*

112. In Feb 2020 SDA declined to file charges against Weamer. Before the non-prosecution decision was made none of any member of SDA met with Plaintiff in person, nor did they ever speak to her about the alleged assaults.

113. On Feb 10, 2020 during a recorded phone call conversation Laura Passaglia ("Passaglia", SDA prosecutor) told Plaintiff this case was fairly old regardless of no statute of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    limitation for rape. Despite corroboration is not require by law Passaglia announced "We don't

2    have any opportunity to do any investigation or find any corroboration".

3         114.    Passaglia went on and told Plaintiff "It's not enough for me to say conclusively

4    what exactly occurred" and such statement is completely opposite to the prosecution guideline set

5    forth by NDAA. Despite sexual assault cases rarely have witnesses Passaglia declared "There is

6    no opportunity to interview any witnesses and talk to people in real time."

7         115.    On Feb 15, 2020 Plaintiff emailed Anne Masterson ("Masterson", SDA

8    prosecutor) and encourage her to follow the prosecution guidelines but Plaintiff's email was

9    ignored, reflecting SDA's dismissive attitude.

10        116.    At that time, and at all relevant times, Passaglia and Masterson were aware of

11   SDA's mission and their role as a prosecutor.

12        117.    In Feb 2020 Plaintiff filed complaint with Jill Ravitch ("Ravitch", District

13   Attorney of Sonoma County) but no action was taken.

14        118.    By failing to discipline or act, Sonoma County and Ravitch endorsed or approved

15   the unconstitutional conduct of individual employees.

16        119.    Plaintiff requested SDA's prosecution policy for sexual assault but no such thing

17   exists as Missoula County Attorney's Office does. <MISSOULA COUNTY ATTORNEY'S

18   OFFICE SEXUAL ASSAULT POLICY & PROCEDURE MANUAL> (https://dojmt.gov/wp-

19   content/uploads/SEXUAL-ASSAULT-POLICY-AND-PROCEDURE-MANUAL.pdf )

20        120.    RAVITCH failed to draft or implement procedures in the District Attorney's

21   Office to ensure proper investigation of rape cases and proper review and handling of sexual

22   assault prosecutions.

23                                  *Rape in 2019*

24        121.    On or about April 1, 2019 Carlos Suarez (aka Charlie Suarez, hereinafter

25   "Suarez") friended Plaintiff via a mobile app "Wechat". After a few days of chatting, on or about

26   April 5, 2019, Suarez invited Plaintiff out for a dinner date. Plaintiff went home after a two-hour

27   dinner with Suarez but later Suarez brought over Japanese whiskey and Spanish wine. Plaintiff

28   and Suarez had been drinking in Suarez's car for about three hours. Plaintiff eventually lost

1   consciousness after consuming a lot of alcohol.

2       122.    On or about April 6, 2019 at around 8:00 am Plaintiff woke up in an unfamiliar

3   place, naked with a sore vagina. Suarez was also naked lying in bed next to Plaintiff. Plaintiff was

4   still drunk and confused about what had happened. Suarez inserted his penis into Plaintiff's

5   vagina but she didn't know what to say or what to do. Plaintiff was completely lost and everything

6   was way beyond her comprehension. She didn't resist because she's afraid of any confrontation

7   and escalated situation. She remained silent and went along with what the offender wanted

8   because she reasonably believed that Suarez would commit violence against her if the situation

9   was escalated. Plaintiff never gave her consent to sexual contact with Suarez while she was

10   awake not to mention when she was unconscious.

11       123.    On or about May 3, 2019 Plaintiff lured Suarez to a hotel and stood him up which

12   was the last time Plaintiff saw Suarez. Between April 7, 2019 and May 3, 2019 Plaintiff not only

13   had no sexual contact with Suarez but also declined his sexual advances.

14       *EMPD and LASD's Failure to Investigate Plaintiff's Sexual Assault Claim*

15       124.    Plaintiff finally gathered her courage to come forward on June 7, 2019. At the time

16   she believed that coming forward would be her first step to heal and it was her obligation to

17   report it to stop it. However, it turned out she was completely wrong and her life has been turned

18   upside down.

19       125.    On June 7, 2019 plaintiff was interviewed by Martha Tate ("Tate", police officer)

20   at El Monte Police Department ("EMPD"). During the interview no victim services personnel

21   was present and Plaintiff was not informed that she had the right to request a victim advocate.

22   However, EMPD's policy states that "Whenever possible, a member of SART should be included

23   in the initial victim interviews."

24       126.    The first session of the interview was not recorded and during that session Plaintiff

25   told Tate she was afraid to upset Suarez when she woke up in an unfamiliar place in the morning

26   of Apr 6, 2019. When Tate told Plaintiff to retell the story for recording purposes Plaintiff was

27   very frustrated. Plaintiff was re-traumatized by recounting the incident twice. Throughout the

28   interview Plaintiff noticed Tate's fake smile and the way Tate looked at her with skepticism.

127.   Despite the crime was facilitated by alcohol Tate asked Plaintiff "Did he force you?" Nobody needs force to rape an unconscious woman. Nobody needs force to rape a woman who's in shock and fear. Alcohol is a weapon of choice by perpetrators. Regardless of silence is not consent, by asking irrelevant questions Tate focused on physical force instead of the absence of consent. From the very outset Tate had no intention to uncover the truth that there was no word or conduct indicating Plaintiff's freely given agreement to sexual contact.

128.   At the end of the interview, without any investigation, Tate willfully smirked and announced to Plaintiff that it was not a rape. Tate's statement was like a bombshell that caused Plaintiff to raise her voice and yell "he admitted it." Tate didn't care and showed Plaintiff out. Tate's comment suggests that she believed this was just a drunken night rather than a crime. It is not a policy of EMPD to tell victims of burglaries or attempted murder that their allegations are NOT a crime. The power of Tate's announcement was no different than a bullet shot in Plaintiff's head.

129.   After the initial interview Tate falsified her incident report by fabricating Plaintiff gave consent and willingly had sexual intercourse with Suarez because Plaintiff wanted to do so. This action reflects Tate's discriminatory intent to dismiss Plaintiff's allegation.

130.   Plaintiff, after waking up naked in an unfamiliar place with a sore vagina, told her simple and plain narrative to Tate: she didn't know what to do and she was afraid to upset the attacker which implies she's afraid of the consequence of confrontation and escalated situation. Tate twisted the story, bypassing the appropriate context and substituting instead the more familiar account of a sexual encounter. Having preempted Plaintiff's story with one of her own, Tate's falsified report made sense given the premises of her announcement. In other words, before any investigation, Tate had drawn her own conclusion: this was not a rape. Tate's willful denial of what Plaintiff had experienced was the result of stereotyped assumption about the truth of a reported sexual assault, that women are likely to report "regretted sex" as rape.

131.   Plaintiff told her narrative to Tate on tape: she didn't say no, she didn't say yes when Suarez had sex with her after she woke up. Having sex was not what she wanted. Tate distorted the story with her discriminatory mind, again replacing Plaintiff's story with one of her

22

1  own, Tate wrote in her report that Plaintiff gave consent and willingly had sexual intercourse with

2  Suarez because she wanted to do so.

3      132.    Plaintiff told her narrative to Tate: Suarez told Plaintiff to book a hotel. Plaintiff

4  didn't do so because she didn't want to have sex with Suarez in the first place, but she went out for

5  dinner with Suarez. Plaintiff went home straight after dinner with Suarez. Tate distorted the story,

6  again replacing Plaintiff's story with one of her own, Tate wrote in her report that Plaintiff was

7  supposed to meet Suarez in a motel but she changed her mind.

8      133.    Plaintiff showed Tate Suarez's indirect confession stating that "I felt like you were

9  a virgin and I was stretching you out." However, Tate maliciously omitted this most important

10  text message in her report.

11      134.    Tate's willful refusal to take Plaintiff at her words - that she had been raped - and

12  Tate's malicious conclusion are symptomatic of a widely recognized stereotype: law

13  enforcement's deep-seated distrust of rape victims.

14      135.    After the second time Plaintiff recounted her story, Tate's question "What brings

15  you here today?" reflects her doubt about Plaintiff's allegation and explains Tate's initial motive

16  to falsify her report. A victim of other types of crime would not be asked the same question.

17      136.    Tate asked Plaintiff what made her think she was a victim of rape based on Tate's

18  assumption about sexual assault victims are lying. Victims of other type of crimes would not be

19  asked the same question. Such humiliating and degrading question strongly suggests her

20  discriminatory animus towards rape victims.

21      137.    Tate's incident report is a summary of her version of events from her

22  discriminatory perspective instead of Plaintiff's.

23      138.    Tate did not inform Plaintiff of victims' rights. At that time, and at all relevant

24  times, Tate was aware of her duties as an EMPD police officer, specifically adherence to EMPD's

25  policy regarding Sexual Assault Investigations.

26      139.    Although Plaintiff filed internal complaint against Tate she has remained on her

27  job without any discipline. Tate's conduct was approved and/or endorsed by EMPD.

28      140.    On or about June 12, 2019 Plaintiff had a phone conversation with EMPD

1   Detective Art Saenz ("Saenz"). Right off the bat, without asking any meaningful question, Saenz
2   assumed Plaintiff didn't remember giving consent. Plaintiff immediately raised her voice and
3   responded "He confessed."

4        141.   On or about June 13, 2019, days after Plaintiff's encounter with Tate, while
5   struggling immensely with Tate's announcement, Plaintiff ended up in urgent care for severe
6   sleep disorder.

7        142.   Because of jurisdiction Plaintiff's case was forwarded to LASD by EMPD.

8        143.   On or about July 2, 2019 Plaintiff arrived at LASD's city of Industry station for the
9   appointment with Liliana Jara ("Jara", LASD detective). While Jara showed Plaintiff the way to
10  Jara's office Plaintiff told Jara that she was on medication for depression.

11       144.   After Plaintiff sat down in Jara's office Jara asked Plaintiff to recount her story but
12  not long after Plaintiff started Jara assumed that Plaintiff didn't remember giving consent. Jara
13  ignored Plaintiff telling her it was not the case. Jara refused to take Plaintiff's answer and grilled
14  Plaintiff "you ever had this situation that your friend told you that you danced last night when you
15  were drunk and you don't remember?" Plaintiff had to raise her voice and respond "NEVER". It
16  came across Jara was so intimidating and bullying. It also demonstrates how Jara coerced Plaintiff
17  to recant her allegation of rape, reflecting her malicious and discriminatory intent.

18       145.   After Plaintiff refused to recant her allegation, Jara's question - "What do you want
19  here?" - indicates that she believed that Plaintiff was making a false allegation to gain something
20  else. Jara's humiliating and degrading question was nowhere to be found in LASD's standard
21  operating procedures or investigation guide. Her question is simply a good starting point to
22  devalue Plaintiff's credibility. "What do you want here?" is the main theme of Jara's investigation
23  right from the outset. Victims of other type of crimes would not be asked the same question.
24  Jara's question caused Plaintiff to raise her voice in shock and answer "I want JUSTICE."

25       146.   When Jara was reading Plaintiff's conversations with Suarez she stated "It doesn't
26  look like you were raped." Jara's stereotyped remarks reveal her stereotypical distrust towards
27  rape victims. Such stereotype about how victims should behave violates the Equal Protection
28  Clause, United States v. Virginia, 518 U.S. 515, 517 (1996), and interferes with the ability of

<div align="center">24</div>

1   investigators to find the truth. Then Jara questioned Plaintiff again "Why did you say 'I can make

2   you lose your job'?" Jara never missed a chance to challenge Plaintiff's every word and action.

3       147.    Plaintiff insisted that Suarez confessed he was stretching her out. Jara further

4   intimidated Plaintiff "That's not a confession. Did he say he raped you?" Jara expected that there

5   was only one form of confession.

6       148.    Jara also argued that a woman's vagina would not be loosened when they are

7   aroused. Then Plaintiff asked her how a woman would give birth. After Plaintiff got home she

8   had to send Jara a medical article describing how a woman's vagina changes under different

9   circumstances to enrich her knowledge about a woman's body part.

10      149.    Jara questioned Plaintiff's intent to come forward. She concluded that Plaintiff

11  came forward because she found out Suarez was cheating and she was mad. Again, Plaintiff had

12  to raise her voice to deny Jara's accusation.

13      150.    Jara said founding out his cheating could be Suarez's defense. Plaintiff flat out

14  said "that's not a valid defense" but in response she said "yes it is". The entire time Jara was

15  trying to discourage Plaintiff following through her allegation rather than discover the truth.

16      151.    Text messages showed that Suarez put words in Plaintiff's mouth and invited

17  himself over but Jara concluded that Plaintiff invited him over. Jara kept challenging Plaintiff

18  why she did this/that as if she was a criminal. Jara said Plaintiff's text messages after April 6

19  looked like she was ok with having sex in the motel by ignoring how Plaintiff processed trauma.

20      152.    Plaintiff showed Jara some articles that finally made her come forward but Jara

21  didn't bother to know what they were about and attacked Plaintiff that she printed them out after

22  the police report was filed despite the fact that nowadays most people read on screen instead of

23  paper, reflecting Jara's dismissive attitude. The entire time Jara put Plaintiff into a defense mode

24  that Plaintiff had to defend herself although she was a crime victim.

25      153.    Jara's assumptions made Plaintiff reach the point that she had to yell multiple

26  times "I date him does not mean I want to have sex with him. How come I did not have sex with

27  him after April 6?" Jara put Plaintiff in a position that she was extremely frustrated to the level

28  that she couldn't express herself and wanted the "interview" to end as quickly as possible because

1    the entire "interview" was conducted in a very accusatory manner, very threatening.

2        154.    Jara kept saying this case was going nowhere, this case had a lot of problems. She

3    also said "if all you want is to arrest this guy it is not gonna happen. I will not make an arrest."

4    Jara's announcement reflects her discriminatory intent to invalidate Plaintiff's allegation.

5        155.    It is not a policy of LASD to constantly tell victims of burglaries or attempted

6    murder that their allegations are problematic and impossible to prove beyond a reasonable doubt.

7        156.    At the end of the interrogation Jara told Plaintiff "I will get his phone and see if

8    there's more messages." Her statement again reflects her presumption that Plaintiff was lying or

9    hiding something else. Her statement also implies "If you are lying you will get arrested."

10       157.    Plaintiff suffered a sexual attack while she was unconscious after drinking.

11   Against this backdrop, Jara's demeaning and accusatory tone of questioning was suspect and

12   suggestive of discrimination. Jara's discriminatory attitude explained why she assumed that

13   Plaintiff did not remember giving consent and stated that "It doesn't look like you were raped."

14   Jara's conduct reflects she discredited Plaintiff's statements because Plaintiff consumed alcohol.

15       158.    No useful information was extracted during Plaintiff's encounter with Jara. No

16   question regarding the crime element was asked. Instead, the only motive of this "interview" was

17   to challenge Plaintiff's every word and reaction. The only intent of this "interview" was to

18   invalidate and dismiss Plaintiff's allegation. Rather than work with the victim and gather

19   evidence according to each element of the crime Jara repeatedly declared that this type of case

20   was problematic which could not be proven beyond a reasonable doubt. The "interview"

21   conducted by Jara was meaningless with respect to proving a crime.

22       159.    Jara did not inform Plaintiff of victims' rights as set forth in California

23   constitution.

24       160.    After the "interview" with Jara Plaintiff's depression and anxiety have been

25   exacerbated to a whole new level.

26       161.    Again and again, Plaintiff has not been treated like the victim in this case. The

27   trauma Plaintiff has experienced at the hands of law enforcement personnel prevented her from

28   having any kind of normal life.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

162.    On or about July 3, 2019 Plaintiff was really concerned by Jara's attitude and she believed that Jara was not able to appropriately manage her case. Plaintiff reached out Richard Ruiz ("Ruiz", LASD lieutenant) and requested another detective to work on her case but her attempt was not successful. Jara remained on Plaintiff's case.

163.    In July 2019 Plaintiff filed separate complaints against Jara and Special Victims Bureau with both LASD and Inspector General. Jara has remained on her job without any discipline and now she has been promoted as a sergeant. Plaintiff never received any results of the internal investigation. Jara's conduct was approved and/or endorsed by LASD.

164.    In July 2020 Plaintiff also reported her experience to Newsom but her voice fell on deaf ears.

165.    On or about July 22, 2019, while Jara was on vacation, Plaintiff reached out Ruiz to get her phone back. Over the phone while discussing the case Plaintiff was challenged by Ruiz "How did you not know you were violated?" His question left Plaintiff feeling coming forward was a punishment to herself and she should not have reported the incident to the police at all. Such victim blaming does not occur with other types of crimes.

166.    On Aug 6, 2019 Jara arranged a follow-up interview with Plaintiff on Aug 8, 2019 at City of Industry Station.

167.    On Aug 8, 2019, upon arrival at City of Industry Station Plaintiff was arrested by Santa Ana Police. Plaintiff had been really concerned because she thought she missed the follow-up interview with Jara.

168.    On Aug 12, 2019 Plaintiff was charged with misdemeanor but she has not been convicted.

169.    Despite pretext phonecall is a commonly used technique to obtain confession from the offender Jara opted not to use it but on or about Aug 14, 2019 she told Plaintiff she had done everything she could. Plaintiff was never notified after law enforcement contact with the suspect reflecting a serious disregard for Plaintiff's safety.

170.    On or about Aug 14, 2019 Plaintiff phoned Ruiz to inquire the investigation but in an intimidating manner Plaintiff was challenged by Ruiz about her gofundme page which was her

private business and had nothing to do with the crime in question. It reveals that LASD Officers' true motive was to spend more energy and time on proving Plaintiff was filing a false claim rather than prove there was a crime occurred. It demonstrates how LASD Officers misused state resources to conduct illegal search and seizure.

171.    In August 2019 Plaintiff's complaint against Jara was turned into a service comment report and being investigated by Ruiz.

172.    The language and attitude of Jara and Ruiz suggests that LASD Officers made minimal or maybe no effort to interrogate or investigate the suspect in Plaintiff's case.

173.    On or about Aug 16, 2019 Plaintiff ended up in ER for dysfunctional menstrual bleeding. In Plaintiff's entire life it was her very first time to visit ER.

174.    On or about Aug 23, 2019 LADA declined to file charges against Suarez. Plaintiff finally realized there was no follow-up interview with Jara in the first place. The follow-up interview was a trap set up by Jara for Plaintiff's arrest by Santa Ana Police.

175.    On Aug 23, 2019 Plaintiff called LADA and requested to speak with the prosecutor in her case. It is prosecutor's duty to educate juries that just because a woman has an open criminal case it doesn't mean that she is not a victim of sexual assault. Despite simply filing a motion to limine can keep out irrelevant or prejudicial evidence June Chung ("Chung", LADA prosecutor) falsely told Plaintiff that the open case in Orange County against Plaintiff affected her credibility and made the filing charges against Suarez impossible which was a clear deprivation of Plaintiff's rights secured to her under Fourteenth Amendment. At the time Plaintiff was not convicted and was charged with misdemeanor. The choice of misdemeanor over felony is a callous disregard for victim and community safety, reflecting Chung's dismissive attitude towards rape victims. Having an open criminal case does not justify the deprivation of a victim's fundamental rights. A victim of attempted murder or other crime would not be told his/her open criminal case would affect his/her credibility.

176.    Regardless of corroboration the ostensible reason for non-prosecution given by Chung was that Plaintiff's case was a "he said she said" case. Given the fact that the suspect admitted he tore apart Plaintiff's vagina this is obviously an untrue statement.

28

177.     Despite alcohol is a weapon of choice another purported reason for non-prosecution given by Chung was "You also voluntarily consumed alcohol, correct?" which suggests a strong purposeful animus towards Plaintiff. A burglary allegation would not be dismissed because the victim forgot to lock the door or close the window.

178.     Plaintiff was concerned by Chung's attitude and requested to speak with her supervisor.

179.     On Aug 23, 2019, Chung's supervisor, Karen Thorp ("Thorp"), called Plaintiff and during the phone call Thorp was reading Tate's falsified report. Thorp's statement - "We can't prove it in court to a jury that **a jury is not likely to convict**." – is a far departure from professional standards. "**If someone thinks they were raped** and then they have consensual sex with someone, then they have a relationship and they only go to the police after the breakup." Thorp's stereotype about how victims should behave constitutes purposeful unlawful discrimination.

180.     When there's no issue about who the assailant is DNA doesn't really contribute anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says on jury instruction, Thorp falsely told Plaintiff that in order to prove a case "We need **a forensic medical exam**. We need his semen. We need **evidence of force**."

181.     By intentionally ignoring all the circumstantial evidence Thorp made an untrue statement "We need something more than **the victim alone saying that this happened**." "**But it's the way the law is**."

182.     Despite most sexual assault victims either delay reporting or never report the crime Thorp made a statement "If you're raped you go to the police right away." Thorp's stereotype about how victims should behave constitutes unlawful discrimination.

183.     Thorp kept going "It doesn't sound like you were raped." "If I was raped …" A victim of robbery wouldn't be told "It doesn't sound like you were robbed."

184.     When Plaintiff pointed out Suarez's predatory behavior to ply her with alcohol Thorp's statement - "**It doesn't matter. You drank it**." – suggests a strong animus towards rape victims because a victim of burglary would not be told "It doesn't matter. You didn't lock your

29

door." Thorp's language also reflects her discriminatory intent to discard Plaintiff's allegation and her eager to shut Plaintiff out of criminal justice system.

185.    At that time, and at all relevant times, Thorp was aware of LADA's mission and her role as a prosecutor and supervisor. At all times Plaintiff has been wondering what a victim means to LADA Officials.

186.    Plaintiff finally experienced the despair and emotional distress of living with the knowledge that her rapist would never be held accountable for his act, and nothing was stopping him from assaulting others. Plaintiff's rapist was well protected by law enforcement while she was not and he walks free with the confidence that he can rape other women with no repercussions.

187.    On or about Aug 30, 2019, as a direct result of injustice and unlawful discrimination after sexual assault Plaintiff felt hopeless and worthless, therefore she was transported to the hospital and put on suicidal watch for five days.

188.    On or about Sep 15, 2019 Plaintiff moved out to a new home for fear of her safety.

189.    On or about Sep 27, 2019, Plaintiff obtained a copy of the incident report prepared by Tate from Special Victims Bureau. Plaintiff was dumbfounded when reading that Tate wrote in her report "She gave consent and willingly had sexual intercourse with him because she wanted to do so." At that moment Plaintiff's world just went black.

190.    Immediately Plaintiff went to EMPD and the watch commander on duty was Michael Buckhannon ("Buckhannon") at the time. Buckhannon agreed to replay the interview type in front of Plaintiff and two victim advocates from Peace over Violence. During Plaintiff's interview with Buckhannon, by repeating Tate's pattern (telling the victim it was not a rape before any investigation), before carefully and completely listening to the entire interview tape, before going into any details or facts, Buckhannon started applying double standard and steadfastly defending Tate, and told Plaintiff it was not fair to Tate to make an allegation against her. Buckhannon also justified a falsified police report by telling Plaintiff that Tate would need just a little bit training.

191.    In the waiting room, looking at the falsified police report, Plaintiff asked her

30

1    victim advocate Anne "Can you imagine how many victims didn't get the justice they deserved?"

2    192.    Out of the blue, Buckhannon asked Plaintiff "Were you married?" Plaintiff

3    answered "No" with confusion. Then Buckhannon declared that he had been married for twenty

4    years and he did not ask for consent each time he had sex with his wife. (which implies "I have

5    been raping my wife for twenty years but she didn't file a complaint so you shouldn't have filed

6    this complaint.") Such remarks strongly suggest an intention to treat sexual assault cases less

7    seriously than other assaults, as well as an animus against rape victims. Buckhannon's pro-

8    defendant attitude is capable of several interpretations: perhaps he believed that women cry rape,

9    that men are always entitled to sex in a relationship, that Plaintiff was not entirely blameless

10   because she was dating the attacker, that such assault was less severe and traumatic because she

11   knew the perpetrator, or that state officials should not intrude upon non-stranger sexual assaults.

12   Whatever the reason, Buckhannon's language reflects an outdated misconception concerning

13   sexual assaults that cannot be used as a source of differential treatment. Buckhannon's statement

14   also demonstrates his discriminatory intent to devalue Plaintiff's allegation.

15       193.    After Plaintiff stepped out of Buckhannon's office she immediately realized that

16   she forgot her document on his desk. Therefore, Plaintiff returned and retrieved her document on

17   Buckhannon's desk. Despite the document belonged to Plaintiff Buckhannon told her it was

18   disrespectful to take something from his desk without asking. However, Buckhannon thinks it is

19   fine for a man to put his penis in Plaintiff's vagina without asking for consent. It demonstrates

20   how Buckhannon devalues Plaintiff's bodily integrity.

21       194.    At that time, and at all relevant times, Buckhannon was aware of his duties as a

22   EMPD member and his role as a supervisor.

23       195.    On Sep 27, 2019, in the presence of Plaintiff's victim advocate, EMPD Officer

24   Carlos Tello conducted a supplemental interview in a hostile manner which caused Plaintiff's

25   victim advocate to pause the interview for a couple of times.

26       196.    Finally Plaintiff realized why Tate smirked and told her it was not a rape. Tate's

27   falsified report and omission of material fact was not a legitimate exercise of discretion. Tate's

28   falsified report and omission of material fact was highly unlikely to have been a product of

1   random mistake but was a clear reflection of her ill will and discriminatory animus towards

2   Plaintiff because of her status as a woman reporting rape. Little did Plaintiff know, at the time

3   Tate was a senior police officer that was too senior to be able to make such "mistake".

4   (https://transparentcalifornia.com/salaries/2018/el-monte/martha-tate/) In fact, Tate and

5   Buckhannon were implementing EMPD's discriminatory custom rather than frustrate EMPD's

6   written policy.

7       197.   On or about Oct 4, 2019 Plaintiff filed a police misconduct complaint against Tate

8   but Plaintiff received neither any acknowledgement from EMPD that they have received her

9   complaint nor any results of the internal investigation.

10       198.   Officer misconduct complaints are not used to identify possible problematic trends

11   within EMPD and failure to discipline officers has been permitted and tolerated for years which

12   resulted in continuing violations of citizens' constitutional rights.

13   (https://www.sgvtribune.com/2018/08/15/el-monte-west-covina-police-departments-criticized-

14   for-citizen-complaint-processes/)

15       199.   In October 2019 Plaintiff and her victim advocate met with Cagney and Chung.

16   Cagney assured Plaintiff that he would personally look into the case.

17       200.   In October and November 2019 Plaintiff repeatedly requested the investigative

18   report prepared by Jara but her requests were denied by Lieutenant Michael Burse with Special

19   Victims Bureau and she was told she would need a subpoena and attorney for the said purposes.

20       201.   In November 2019 Plaintiff filed a complaint against Officer Tate with LADA's

21   justice system integrity division but her complaint was referred back to EMPD.

22       202.   On or about Nov 28, 2019 Plaintiff attempted suicide by trying to overdose

23   sleeping aid. The life-long devastating harm caused by sexual assault is profound and exacerbated

24   by law enforcement personnel's deprivation of Plaintiff's fundamental rights secured to her by

25   laws.

26       203.   In December 2019 Plaintiff requested LASD's policies and procedures regarding

27   sexual assault investigation but her request was denied.

28       204.   After Plaintiff's repeated inquiries and Cagney's delaying tactic, on Jan 7, 2020

1   Plaintiff received a joint phone call from Cagney, Thorp, and Chung. Despite Plaintiff never gave

2   her consent to Suarez the ostensible reason for non-prosecution given by Cagney was "You had

3   sex with him. You had contact with him." Despite most rape victims either delay reporting or

4   never report the crime, especially the perpetrator is non-stranger, Cagney falsely told Plaintiff the

5   case was not able to prove beyond a reasonable doubt because "You delayed reporting.",

6   reflecting LADA Officials' dismissive attitude. The insufficient evidence although purporting to

7   be reasonable but in fact was a disguise and pretext for intentional discriminatory under-

8   enforcement against rape victims.

9

10                          *Selective under-enforcement*

11      205.    The American Bar Association standard related to Prosecution Function says that

12   the duty of the prosecutor is to seek justice, not merely to convict. However, prosecutors tend to

13   avoid losing at trial simply because rape cases are hard to win and they pick easy cases to make

14   their personal conviction rates look good for their resumes (their powerful incentive to

15   discriminate against rape victims).

16      206.    Plaintiff finally experienced the despair and emotional distress of living with the

17   knowledge that her rapists would never be held accountable for their acts, and nothing was

18   stopping them from assaulting others. Plaintiff's rapists were well protected by law enforcement

19   while she was not and they walk free with the confidence that they can rape other women with no

20   repercussions. A rapist's words prevail and conquer in every aspect but none of Plaintiff's words

21   ever counts.

22      207.    The depth of law enforcement personnel's discriminatory treatment of sexual

23   assault victims is all the more troubling given the recent expansion of societal awareness of and

24   sensitivity to sexual assault.

25      208.    The current organizational structure of the said law enforcement agencies is not

26   capable of adequately addressing the victimization and lifetime damage inflicted on sexual assault

27   victims or to stop repeat perpetrators, particularly those who sexually assault women they know

28   or who use drugs/alcohol to commit their sexual assaults.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  &lt;Educating Juries in Sexual Assault Cases&gt;

2  http://www.ncdsv.org/images/AEquitas_EducatingJuriesInSexualAssaultCasesPart1_7-2010.pdf)

3

4  **FIRST CAUSE OF ACTION**

5  **Equal Protection Clause of Fourteenth Amendment to U.S. Constitution**

6       209.  Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

7  the paragraphs above.

8       210.  The Fourteenth Amendment prohibits the states from denying to all persons within

9  its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and

10  denying the equal protection of the laws includes the omission to protect.

11       211.  Cal. Penal Code §739 discriminates against crime victims by depriving their rights

12  to criminal justice for protection and accountability.

13       212.  Plaintiff has no adequate remedy at law and will suffer serious and irreparable

14  harm to her constitutional rights unless this Court grants her injunctive relief.

15

16  **SECOND CAUSE OF ACTION**

17  **Violation of Cal. Const. Art. I, § 7 – Equal Protection**

18       213.  Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

19  the paragraphs above.

20       214.  Cal. Penal Code §739 monopolizes criminal prosecution and constitutes a violation

21  of Article 1, § 7 of the California Constitution.

22

23  **THIRD CAUSE OF ACTION**

24  **Violation of Cal. Const. Art. I, § 28 (a)**

25       215.  Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

26  the paragraphs above.

27       216.  As California Constitution Art. I, § 28 defines, a "victim" is a person who suffers

28  direct or threatened physical, psychological, or financial harm as a result of the commission or

34

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   attempted commission of a crime or delinquent act. The term "victim" also includes the person's

2   spouse, parents, children, siblings, or guardian, and includes a lawful representative of a crime

3   victim who is deceased, a minor, or physically or psychologically incapacitated.

4      217.   California Constitution Art. I, § 28 (a) (2) provides that "Victims of crime are

5   entitled to have the criminal justice system view criminal acts as serious threats to the safety and

6   welfare of the people of California. The enactment of comprehensive provisions and laws

7   ensuring a bill of rights for victims of crime, including safeguards in the criminal justice system

8   fully protecting those rights and ensuring that crime victims are treated with respect and dignity,

9   is a matter of high public importance. California's victims of crime are largely dependent upon

10  the proper functioning of government, upon the criminal justice system and upon the expeditious

11  enforcement of the rights of victims of crime described herein, in order to protect the public

12  safety and to secure justice when the public safety has been compromised by criminal activity."

13     218.   California Constitution Art. I, § 28 (a) (4) provides that "The rights of victims also

14  include broader shared collective rights that are held in common with all of the People of the

15  State of California and that are enforceable through the enactment of laws and through good-faith

16  efforts and actions of California's elected, appointed, and publicly employed officials. These

17  rights encompass the expectation shared with all of the people of California that persons who

18  commit felonious acts causing injury to innocent victims will be appropriately and thoroughly

19  investigated, appropriately detained in custody, brought before the courts of California even if

20  arrested outside the State, tried by the courts in a timely manner, sentenced, and sufficiently

21  punished so that the public safety is protected and encouraged as a goal of highest importance."

22     219.   California Constitution Art. I, § 28 (a) (8) provides that "To accomplish the goals

23  it is necessary that the laws of California relating to the criminal justice process be amended in

24  order to protect the legitimate rights of victims of crime."

25     220.   Cal. Penal Code §739, without recognition of the profound failure of the present

26  criminal justice system, does not promote the purpose of constitution.

27

28

**FOURTH CAUSE OF ACTION**

35

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1         **Violation of Cal. Const. Art. I, § 28 (b) – Victims' Bill of Rights**

2         221.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

3 the paragraphs above.

4         222.    California Constitution Art. I, § 28 (b) (1) provides that a victim shall be entitled

5 "to be treated with fairness and respect for his or her privacy and dignity, and to be free from

6 intimidation, harassment, and abuse, throughout the criminal or juvenile justice process."

7         223.    The monopoly on criminal prosecution, without regard to crime victims'

8 fundamental rights, has violated the rights of Plaintiff to be treated with fairness and respect of

9 her dignity.

10

11                             **PRAYER FOR RELIEF**

12         WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment:

13        1.    Declaring that Cal. Penal Code §739 violates Equal Protection Clause of Fourteenth

14            Amendments to the U.S. Constitution and Cal. Const. Art. I, §§ 7 and 28 (a) & (b);

15        2.    Preliminarily and permanently compelling Defendants to appoint seasoned and

16            competent prosecutors with sexual assault prosecution expertise to file criminal

17            charges against Edward Weamer and Carlos Suarez;

18        3.    Preliminarily and permanently enjoining Defendants, as well as their successors,

19            agents, and employees, from enforcing Cal. Penal Code §739 against private citizens

20            to initiate criminal prosecution;

21        4.    Awarding attorney's fees and costs as permitted by law; and

22        5.    Granting such other and further relief or sanction as this Court may deem just,

23            proper, and appropriate.

24

25 Dated: May 14, 2020

26

27                                  _____

28                                 JANE DOE, Plaintiff in Pro Se

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

